*315 By the Court,
Edwards, J.
It appears from the testimony that in the year 1845, the firm of Cobb & Bishop were engaged in the forwarding and transportation and commission business ; Cobb residing at Buffalo, and Bishop at Cleveland; and that during the summer and autumn of that year, C. H. Canfield was their traveling agent, and spent a portion of his time at Chillicothe, in that capacity. On the 22d of October, in that year, he received from J. P. Campbell, at Chillicothe, 650 barrels of flour, and on the 27th of the same month he received 325 barrels more. According to the agreement between the parties, the flour thus received was to be sent to Cleveland, to be sold by Cobb & Bishop, and it rvas in fact so sent, with instructions to sell it if it would bring a price which was limited by Campbell. After the flour had arrived at Cleveland, it was ascertained that it could not be sold for the price fixed, and in the month of November, 1845, a new arrangement was entered into between Campbell and Canfield, by which it was agreed that Cobb & Bishop should transport the flour to New-York, to be delivered to the plaintiffs ; and in pursuance of such agreement, an instrument, which the parties called a bill of lading, was signed by Canfield, on behalf of Cobb <fc Bishop. That instrument stated that the flour was received from Campbell at Chillicothe, on the 22d of October, 1845, and that it was to be delivered to the plaintiffs at New-York, without delay; he, or they, to pay freight for the same, at the rate of $1,30 per barrel, and was despatched on arrival at Cleveland and Buffalo. This instrument, although signed in November, and while the flour was at Cleveland, was, at the request of Campbell, dated on the day when the 650 barrels were received at Chillicothe. After the instrument had been delivered to Campbell, it was sent by him to the plaintiffs ; and at, or about the same time, a draft for $4000, dated at Chillicothe, November 26, 1845, was drawn by Campbell upon the plaintiffs, and was afterwards accepted by them, and paid at maturity. A clerk in the employ of the plaintiffs testified that the advance of the acceptance was made upon the flour in question, and was not connected with any other property consigned by Campbell to the plaintiffs. This *316 witness further testified, that on the 3d of December, 1845, the plaintiffs received 25 barrels of flour, and that on the 30th of March, 1846, they received 5 barrels. That on the 4th of May, in the same year, they received 55 barrels ; and that on the 11th of May they received 39 barrels, all of which was the same flour as had been consigned to them by Campbell. Upon this state of facts, the plaintiffs brought their suit, in which they claim to recover damages for the delay in the delivery of the flour, and for the amount of freight which they paid, over and above the stipulated price. The judge before whom the cause was tried, charged the jury that the plaintiffs were entitled to recover the whole amount claimed by them, to which the defendant excepted.
The instrument which was received from Canfield by Campbell, and upon which the plaintiffs advanced their acceptance, was called by the parties a bill of lading. It certainly differs, materially, from the ordinary bill of lading, which has hitherto-been used in commerce. In the first place, it was signed by the agent of a forwarding and commission house, and not by the master of any vessel or boat. It was not a compact for the transportation of the flour, by any particular vessel or boat, but it contemplated transhipments and different modes of conveyance, by the lake and canals. But for the purpose of ascertaining the rights of the parties, I shall first consider it as a bill of lading: and then it will be necessary to consider whether there is any thing in the particular form of the instrument, to vary the rights of the parties.
Although there is some apparent confusion and discrepancy in the different decisions which have been made upon bills of lading, in reference to the respective rights of the consignor and consignee, yet it here seems to be settled, that, as a general rule, a suit founded upon the express contract contained in the bill, should be brought by the shipper with whom the master contracted, or by the owner of the goods, in a case where the shipper acted as his agent. (Brandt v. Bowlby, 2 B. &. Ad. 932. Sargent v. Morris, 3 Barn. & Ald. 277. Berkley v. Walting, 7 Ad. & Ellis, 29. Abbott on Ship. 337.) And that al *317 though the proper indorsement of a bill of lading, will transfer the property in the goods, it does not transfer the compact contained in it. (Thompson v. Dominy, 14 Mees. & Wels. 403.) And a consignee or indorser of a bill of lading has not the right to sue upon the special contract, unless, as has been stated, he is also the shipper or owner of the goods, for the obvious reason, that otherwise, no express contract is made with him. (Anderson v. Clark, 2 Bing, 20.)
It is evident, that no general rule can be laid down as to the rights of the consignee, under a bill of lading, which will be applicable to all cases. His rights will, in some measure, depend upon the particular circumstances of the case.
In the case of Brown v. Hodgson, (2 Camp. 36,) the goods were shipped by order and on account of the consignees, and it was held, that the property vested in the consignees from the time that the goods were put on board the ship. (S. P., Stanton v. Eager, 16 Pick. 467.) In the case of Walley v. Montgomery, (3 East, 585,) goods were shipped to order on account of. and at the risk of the consignee, and a bill of lading to order of assignors, duly indorsed, was, together with an invoice of the goods, sent to him in a letter, informing him that the consignor had drawn bills on him, at three months, for the value of the goods. Another bill of lading was afterwards sent to the agent of the consignor, under which he obtained the goods from the master of the ship, and insisted on immediate payment, by the consignee, as a condition of delivering to him. The consignee offered his acceptances at three months, and on their being refused, brought an action of trover for the goods. It was held, that by the delivery of the goods to the master, and the transmission of the bill of lading and invoice to the plaintiff, the property had passed to him, and that he was entitled to recover. In the case of Anderson v. Clark, (supra,) where goods were shipped and made deliverable by the bill of lading, to the consignee, and it appeared that they were shipped as security for antecedent advances, it was held that the delivery on board the vessel was delivery to the consignee, and that he might maintain an action for the non-delivery by the master to him. In the case *318 of Haille v. Smith, (1 Bos. & Pull. 563,) bills of lading to the shippers’ order, indorsed in blank, being forwarded to the consignees, to secure advances agreed to be made by them to the consignors, and the latter becoming bankrupts, their assignees claimed and obtained the goods from the captain. It was held, that the moment that the goods were shipped, and the bill of' lading indorsed and remitted to the consignees, the property in the goods was changed, and that the captain was liable in trover to the consignees.
From these cases Lord Tenterden infers the general rule, that when a bill of lading by which goods are.made deliverable to a consignee by name, is transmitted to him as security for antecedent advances, or to indemnify him against liabilities in respect to the particular consignment which they represent, they are evidence of such destination and appropriation to him of the specific goods, as will vest in him a property, absolute or special in them, at the time of the delivery on board, and so render the master responsible to him for their loss or injury. (Abbott on Ship. 333.)
It will be observed that this rule, as well as the eases which have been cited in support of it, refers to bills of lading. But there is another case which is analogous to the one before us, in which the same principles were laid down as applicable to a document essentially similar to the one now in question. In that case it was proved that Tempany, a corn merchant at Longford, who employed the plaintiffs in the suit as his factors at Liverpool, shipped on board a canal boat, a cargo of oats, and took from the master a bill of lading, or boat-receipt, dated January 31st, 1837, whereby he acknowledged that the oats were received on board, deliverable in Dublin to J. & T, Delany, in care for, and to be shipped to, the plaintiffs in Liverpool. On the 2d of February, Tempany wrote to the plaintiffs a letter, enclosing the instrument received by him, and'stating that he had valued on the plaintiffs for a specified amount against those oats. On the 7th of the same month, the plaintiffs received this letter, and accepted the bill of exchange, and returned it to Tempany, who received it on the 9th. In the mean time, Tempany gave an order for the same oats, to a creditor, who afterwards got poé *319 session of them. Upon this state of facts, the plaintiffs brought an action of trover. The defense which was set up, was, in most respects, similar to the one which was interposed in the case before us. The court, in giving their opinion, stated that they considered it immaterial whether the instrument given by the master of the boat was a regular bill of lading, so as to possess all the properties which the custom of merchants has attached to such a document. That the true question was, what was the meaning and effect of the document, coupled with the other circumstances of the case. They there say, “ it seems to us to be clearly this, that Tempany agrees that the oats therein specified, shall be held from that time by the boat-master, for the plaintiffs, in their own right, provided they accept the bill, as security for its payment; that the master agrees so to hold them, and that by the plaintiffs’ assent and acceptance of the bill, the conditional agreement becomes absolute.” “ As evidence of such a transaction, it is wholly immaterial whether the instruments are bills of lading or not; and it might be equally proved through the medium of carriers’ or wharfingers’ receipts, or by any other description of document, or by correspondence alone.” And they further say, that it is not “ material whether the person who is to have the property be a factor or not.” (Bryans v. Nix, 4 M. & Wels. 775, 791.) In the case before us, Oobb & Bishop, through their agent, agreed to deliver the flour to the plaintiffs, and that agreement was sent to them, accompanied by a draft upon them for the value of the flour. The whole of this was one connected transaction, and transferred the property in the flour to the plaintiffs; and when they accepted the draft drawn upon them, their title became absolute, subject only to the consignor’s right of stoppage in transitu, which is a mere equitable lien, and not a right of property. (Feise v. Wray, 3 East, 93. Edwards v. Brewer, 2 Mees, & Welsby, 375.)
The first objection made by the defendant to the plaintiffs’ claim, was, that the express contract contained in the bill of lading or forwarder’s receipt, was made with Campbell, not with the plaintiff.
In the case of Anderson v. Clark, above cited, the consignees *320 brought an action of assumpsit against the carrier for non-delivery of the goods consigned to him ; and the court held, that the consignor, in shipping the goods, acted as the agent of the consignee, and they sustained the action. Butin the case before us, it will not be necessary to inquire whether the plaintiffs could sustain their action on the special contract; for it will be seen, upon reference to the pleadings, that this suit is not founded upon an express contract, but upon a breach of duty on the part of the defendant, as a common carrier; or, in other words, it is an action of trespass on the case for negligence, and also for a conversion; and in" order to sustain the action, it is sufficient, as between the parties to this suit, that the relation of bailor and bailee existed.
It appears from the bill of exceptions, that the defendant introduced evidence for the purpose of showing that there had been no unreasonable delay in the delivery of the flour; and that, whatever delay there had been, was caused by circumstances over which he had no control. The judge, in his charge to the jury, stated that the matters given in evidence on the part of the defendant did not, in law, tend to prove any excuse for the delay which had occurred in the transportation and delivery of that portion of the flour which was not delivered to the plaintiff until the spring of 1846, nor entitle the defendant to have the sufficiency of such evidence to excuse such delay, or any portion of it, submitted to the jury. To this part of the charge the defendant excepted; and we think that the exception was well taken.
The testimony shows that at the time when the bill of lading was signed, the flour was at Cleveland, and it certainly tends to show that there was a difficulty in obtaining vessels at that time and place, amounting almost to an impossibility ; at least there was sufficient, upon this point, to entitle the defendant to go to the jury. One witness said that it was almost impossible to get any" transportation from that place. That Cobb & Bishop had written to Buffalo for vessels to come to Cleveland; that the wind was such that they could not get up. They could not get out of Buffalo. Another witness said that the flour was *321 delayed at Cleveland in consequence of scarcity of vessels. Another witness said, he thought that vessels could not have been chartered at Cleveland, between the arrival and shipment of the last of the flour. Another witness stated that Cobb <fc Bishop could not get vessels to ship by; and again he said he thought vessels could not be procured during that time, to take freight to Buffalo at any price. There was other testimony bearing upon the same point. In the case of Parsons v. Hardy, (14 Wend. 215,) it was held, that in respect to the time of delivery, the carrier was responsible only for the exercise of due diligence, and that he might excuse delay in the delivery of the goods, by accident or misfortune ; although not inevitable, or produced by the act of God. The court said: “ it is sufficient if he exerts due care and diligence to guard against delay, if the goods are finally delivered in safety.”
[New-York General Term,
December 1, 1851.
In the ease before us, the judge seems to have placed his charge upon the ground that there was an absolute undertaking contained in the bill of lading, which created a greater liability than that which the law implies from the relation of bailor and bailee. If this action had been founded upon an express contract to deliver without delay, it might be a question whether, inasmuch as the undertaking was absolute, and contained no provision as to any ulterior circumstances beyond the defendant’s control, he was bound to perform it at all events. But no such question arises in this case.
We think that a new trial should be granted, costs to abide the event.
Edmonds, Edwards and Mitchdl, Justices.]